**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1199-20

JOHN DEAN and ALENA DEAN,

    Plaintiffs-Respondents,

v.

LEIGH JAYNES PROVISOR,

    Defendant-Appellant.

_____

Argued January 5, 2022 – Decided July 13, 2022

Before Judges Gilson, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1351-20.

Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the brief).

Jonathan S. Goodgold argued the cause for respondents (Maitlin Maitlin Goodgold Brass & Bennett, attorneys; Jonathan S. Goodgold, of counsel and on the brief).

PER CURIAM

Defendant Leigh Jaynes Provisor appeals from a December 7, 2020 Law Division order granting summary judgment in favor of plaintiffs John and Alena Dean, and awarding damages resulting from defendant's breach of contract in connection with a personal loan. We affirm in part, vacate the award of damages, and remand for further proceedings.

I.

We derive the following facts from the competent evidence in the motion record, "giv[ing] the benefit of all favorable inferences" to defendant. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

Defendant, a "well-known female wrestler" within the wrestling community, partnered with John[1] in two female wrestling entities, Chick Wrestler LLC, and Chicks Wrestling LLC, established to "support the growth of girls wrestling." On February 1, 2019, the parties executed a partnership agreement for Chick Wrestler LLC. Under the partnership agreement, defendant held the "management role" of "Founder, Chairwoman & CMO," and John held the "management role" of "CEO."

---

[1] Because plaintiffs share the same surname, we use their first names to avoid confusion and intend no disrespect.

A-1199-20

Article VI, captioned "Capital Contributions," of the partnership agreement provided as follows:

> Each of the Partners has contributed to the capital of the Partnership, in cash, property, or services in agreed upon value, as follows . . . :
>
> a. [Defendant] – $510 . . . .
>
> b. John T. Dean – $490 . . . .

Article XI, titled "Interest and Authority," provided:

> The Partners' ownership interest in the Partnership will be as follows:
>
> a. [Defendant] – 51% . . . .
>
> b. John T. Dean – 49% . . . .

On February 17, 2019, the parties executed an operating agreement for Chick Wrestler LLC. Under Article IV of the operating agreement, disputes among members would be decided "by a majority vote[,] . . . according to th[e m]ember's percent of ownership interest."

Chicks Wrestling LLC was a related entity. Although no corporate documents related to Chicks Wrestling LLC's operation were provided, defendant would receive monthly monetary distributions from the business if certain funding conditions were met.

A-1199-20

Shortly after the businesses were created, defendant began experiencing financial difficulties in her personal life and accrued various high-interest debts. To enable defendant to consolidate these debts at a lower interest rate, plaintiffs agreed to obtain a $38,000 personal loan from Bank of America with a four percent flat borrowing fee and zero percent interest for twelve months. Thus, the total cost of the loan would be $39,520 if repaid in one year. In turn, plaintiffs would loan the funds to defendant, and defendant agreed to repay plaintiffs for the loan in accordance with specified terms.

On April 13, 2019, in a memorializing email between the parties, plaintiffs provided the terms of the loan agreement as follows:

> [Defendant] agrees to repay this loan with a minimum of making the monthly minimum payment (or $800[], whichever is greater) to keep the account in good standing. [Defendant] will make monthly payments of $2,500[] if funding is achieved and she starts receiving $5,000[] per month as distributed from Chicks Wrestling[] LLC. [Defendant] will maintain the account in good standing and if a balance remains after [twelve] months, [defendant] will be responsible for all costs incurred to keep the account in good standing whether it is paid off or transferred to another account for additional payments at a lower rate.

> If [defendant] defaults on this agreement, for each month that passes where there is no payment or remedy made to correct the unpaid balance, [five percent] of ownership interest in Chick Wrestler[] LLC will be transferred to the ownership of John

4

Dean.  Current ownership levels are [fifty-one percent defendant] and [forty-nine percent] John.

I, [defendant], agree to these terms and conditions.

On the same date, defendant sent an email to plaintiffs with the same text but added her name and the date typed at the bottom, thus acquiescing to the terms of the agreement.  Subsequently, plaintiffs transferred the funds to defendant, and defendant provided plaintiffs with eight post-dated checks, each in the amount of $800, to make the first eight monthly payments on the loan.

In July 2019, the parties' business relationship began to sour, and a battle ensued for control over the businesses.  Defendant made no further payments to plaintiffs on the loan other than the first eight checks.  Thus, by December 2019, defendant was in default on the loan.  The zero-interest promotion on the Bank of America loan ended in March 2020.  Subsequently, Alena borrowed funds from her 401k to pay off the balance of the Bank of America loan as permitted under the loan agreement.  The 401k loan carried a 4.75% annual interest rate.

On July 2, 2020, plaintiffs filed a complaint against defendant, asserting claims for breach of contract, breach of implied covenant of good faith and fair

A-1199-20

dealing, unjust enrichment, and a book account balance. Plaintiffs alleged defendant entered "a loan contract" with them for a total of $39,520, and, since December 2019, failed to pay the minimum of $800 per month "to keep the loan in good standing." Plaintiffs also asserted "the loan provided that for each month there was no payment or remedy on the unpaid balance of the loan, [five percent] of the ownership interest in Chick Wrestler LLC would be transferred to John Dean." Plaintiffs further alleged that due to defendant's default, "[they] had to cover the loan proceeds with additional funds that bear interest and add to the costs due from [d]efendant," leaving an "open, unpaid loan, in the amount of $33,346.29 . . . , plus costs."

Representing herself, on August 25, 2020, defendant filed an answer, asserting she was "making payments [on the loan] . . . per [their] agreement" until plaintiffs began "to take over [her] company, harass friends and family, [and] call current and former business partners making untrue statement[s]." No affirmative defenses or counterclaims were asserted in the answer.

On September 22, 2020, plaintiffs moved for summary judgment, "seeking a judgment of $33,777.65[,] inclusive of contractual pre-judgment interest and costs as of August 31, 2020." In support, plaintiffs submitted a

A-1199-20

statement of material facts in accordance with Rule 4:46-2(a) and John's certification attesting to those facts.

In response, defendant submitted a certification dated October 23, 2020, providing, "plaintiff[s had] offered [her] a personal loan after she complained about working [six] days a week for . . . [them] at the gym for no wage[s]." On November 5, 2020, defendant submitted a second document titled "Counter-claims Statement of Fact," reiterating that plaintiffs "offered [her] the personal loan" to alleviate the "financial hardship" caused by plaintiffs' failure to adequately compensate her for her work in the wrestling businesses as well as use of her name and image in a fund-raising campaign that fell short.

In the November 5, 2020 submission, defendant also accused plaintiffs of acting in bad faith when they improperly ousted her from the businesses. Additionally, she asserted numerous claims against plaintiffs in connection with their business disputes, including fraud, defamation, breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contractual relations, tortious interference with prospective economic advantage, oppression of a shareholder, conversion, and theft.

A-1199-20

On November 13, 2020, the judge conducted oral argument on plaintiffs' summary judgment motion and noted that there was "a lot of discussion regarding other issues" and "other claims." When the judge inquired whether there were any other actions or lawsuits pending between the parties, the parties replied there were none. Plaintiffs asserted that because defendant failed to file a conforming statement of material facts, in accordance with Rule 4:46-2(b), plaintiffs' facts should be deemed admitted and summary judgment should be granted in their favor. Instead of adjudicating the motion, however, the judge adjourned the matter to allow defendant time to properly respond.

Thereafter, defendant submitted an affidavit in which she admitted that she had "accepted a personal loan from . . . plaintiffs" but stated that the loan and the disputed business matters were "related." Defendant maintained that when plaintiffs declared that "[she] was in breach of contract" and "'voted [her] out' as a [fifty-one percent] owner of Chick Wrestler[] LLC," plaintiffs' right to any damages under the agreement was extinguished.

Nonetheless, in the affidavit, defendant averred that each month, until June 2020 when she was served with the summons and complaint, she "continued to deposit checks" in the amount of "$800 . . . into an interest-bearing checking account in good faith" pending "resolution of th[e] dispute."

8

Defendant also submitted a second affidavit attaching a twenty-six-page transcript of a business meeting she had recorded between herself, plaintiffs, and others.

On December 4, 2020, the judge again conducted oral argument during which he pointed out that defendant's submission of the second affidavit and the transcript was "not authorized under the Court Rules" and the documents were not relevant to the loan default. During oral argument, defendant stressed that because plaintiffs had drafted the agreement and had intertwined the default on the personal loan with the ownership of the business, she essentially "paid [John] when he seized control of [the business]." Therefore, according to defendant, summary judgment was improper as plaintiffs had been paid through the penalty provision in the agreement.

In a December 7, 2020 order, the judge granted summary judgment "in favor of [p]laintiffs . . . in the amount of $33,120[], plus interest of $657.65 from April 1, 2020[,] through August 31, 2020 and continuing to accrue for a total judgment amount of $33,777.65." In an accompanying written decision, initially, the judge noted defendant's November 5, 2020 submission "would not be considered as opposition or as an amended pleading, in that it was nothing

A-1199-20

more than a long recitation of grievances," lacking "any relevance to the pending lawsuit," and non-compliant "with the Court Rules."

Next, after reciting the governing legal principles, the judge found it was "undisputed that the parties entered into an agreement for the repayment of the personal loan and . . . [d]efendant ceased making payments in accordance with that agreement." According to the judge, "[a]lthough [defendant] continued to make payments into an interest-bearing checking account" until June 2020, "those payments were not paid or ever forwarded to . . . [p]laintiffs."

Therefore, the judge determined it was "undisputed that [d]efendant breached her obligation under the contract by failing to make the $800[] monthly payments to . . . [p]laintiffs," that "$33,777.65 remain[ed] due and owing pursuant to the loan agreement," and "[t]he [c]ourt was not presented with any defense to enforcement of the contract or any evidence to suggest that the entry into the agreement was improper, unconscionable, or coerced."

The judge described "[t]he separate grievances that [d]efendant articulate[d] in her papers" as "wholly distinct from the narrow issue before th[e c]ourt." The judge explained:

> The [c]ourt is unconvinced that any type of grievance regarding the formation of a partnership or Limited Liability Company . . . between [p]laintiffs and [d]efendant relates to the personal loan which was

extended by [p]laintiffs to . . . [d]efendant. . . . Defendant did not file a counterclaim as to her business-related claims against . . . [p]laintiffs that is cognizable under our Court Rules, and she was afforded additional time to do so. She did not.

The judge also rejected defendant's contention "that her obligation to repay the loan was satisfied in whole or in part by virtue of the existence of a 'penalty provision.'" The judge expounded:

There is a portion of the loan agreement, drafted by [p]laintiffs, that purports to transfer [five percent] of . . . [d]efendant's interest in Chick Wrestl[er] to John Dean in the event that [d]efendant failed to make any single monthly payment. There is no evidence before th[e] court that that provision, whether it is considered a "penalty provision" or otherwise was ever enforced, or, if enforced, whether that [five percent] interest has or had any monetary value.

Thus, the judge concluded "as a matter of law," plaintiffs were "entitled to summary judgment based on [d]efendant's undisputed breach of the agreement."

The judge underscored that the November 5, 2020 submission filed by defendant would "not be considered as an amendment to the previously filed [a]nswer" because "[t]o do so would have required the filing of a formal motion by [d]efendant as well as a proposed amended [a]nswer and [c]ounterclaim," which defendant failed to do. The judge stressed, "[a]ny

claims" pertaining to or arising "from the business known as Chick Wrestler[] LLC," were "not addressed by the [c]ourt in th[e] case, and th[e] decision . . . [was] without prejudice to the right of any aggrieved party to pursue such claim/s in an appropriate forum."

In this ensuing appeal, defendant raises the following arguments for our consideration:

> THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE PLAINTIFFS ON THEIR BREACH OF CONTRACT CLAIM BECAUSE THE SUMMARY JUDGMENT RECORD SHOWED THERE WERE FACTUAL DISPUTES IMPACTING THE ELEMENTS OF THE BREACH OF CONTRACT CLAIM – MOST NOTABLY THE MEASURE OF DAMAGES TO WHICH PLAINTIFFS ARE ENTITLED.
>
> > A. The Measure Of Damages Awarded By The Trial Court Is Alone Ground For Reversing The Grant Of Summary Judgment For Plaintiffs.
> >
> > B. There Were Material Disputes Over Whether Defendant Breached The Loan Agreement In The First Place.
> >
> > C. Summary Judgment Was Improper, Also, Because Defendant's Summary Judgment Filings Raised Affirmative Defenses To Plaintiff[s'] Breach Of Contract Claim That A Jury Can Consider In Determining Whether There Was A Breach.

12

## II.

We review "the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

> [I]f the evidence of record — the pleadings, depositions, answers to interrogatories, and affidavits — "together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations omitted) (quoting R. 4:46-2(c)).]

See also Brill, 142 N.J. at 540.

If no genuine issue of material fact exists, the inquiry turns to "'whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We "accord no deference to the trial judge's conclusions on issues of law." Ibid. "The practical effect of [Rule 4:46-2(c)] is that neither the motion

13

court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

The cause of action pertinent to this appeal is breach of contract. "To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his [or her] obligations under the contract and that the plaintiff sustained damages as a result." Murphy v. Implicito, 392 N.J. Super. 245, 265 (App. Div. 2007). "Interpretation and construction of a contract is a matter of law for the court subject to de novo review." Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

"In interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). "Generally, the terms of an agreement are to be given their plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171

14

N.J. 378, 396 (2002). "If the terms of a contract are clear, [courts] must enforce the contract as written . . . ." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999). However, interpretation of a contract should not be decided on summary judgment when "there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation." Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000).

Applying these principles, it is undisputed that the parties entered a valid contract, that defendant failed to perform her obligations under the contract, and that plaintiffs sustained damages as a result. We reject defendant's assertion that there was no breach of contract because "she continued to deposit checks of $800 each month into an interest-bearing checking account . . . until . . . she was served with the [c]omplaint and [s]ummons." The contract expressly states that defendant agreed to pay plaintiffs a minimum monthly payment of $800, which defendant concedes she failed to do. There was no provision in the contract for payments into an escrow account. See Sullivan as Tr. of Sylvester L. Sullivan Grantor Retained Income Tr. v. Max Spann Real Est. & Auction Co., 465 N.J. Super. 243, 265 (App. Div. 2020) ("Contract terms must be given their plain and ordinary meaning."), aff'd as modified, __ N.J. __, __ (2022).

A-1199-20

Equally unavailing is defendant's claim that the affirmative defenses of unconscionability and duress, pled in her November 5, 2020 submission, raised material disputed facts that should have been submitted to a jury for a determination as to whether she breached the contract. As the judge correctly pointed out, defendant's November 5, 2020 submission was not cognizable as an amended answer because defendant failed to comply with the Court Rules. See R. 4:9-1 (providing that once ninety days after service of a responsive pleading have elapsed, a party may amend a pleading by filing a motion for leave to amend with a copy of the proposed amended pleading annexed thereto).[2]

In any event, we reject defendant's claim that a jury could find "that the contract was unconscionable or invalid" because the stress of her personal finances caused her to agree to the loan terms under duress. We have previously recognized that feeling pressure about personal finances "do[es] not constitute economic duress in the legal sense, which has been defined as a wrongful or unlawful act that deprives the victim of his [or her] unfettered will." Minoia v. Kushner, 365 N.J. Super. 304, 312 (App. Div. 2004).

---

[2] For the same reason, we reject defendant's contention that the allegations contained in her November 5, 2020 submission were relevant to the damages to which plaintiffs were entitled on their breach of contract claim.

Defendant proffers no credible evidence to suggest plaintiffs' conduct dominated her in such a way as to deprive her of her "unfettered will."

Finally, defendant contends that the judge erred in calculating damages because he "accelerat[ed] the total amount of the debt" when "[t]he terms of the agreement [did] not contain an acceleration clause" and failed to consider the stipulated damage clause providing for the transfer of ownership interest in Chick Wrestler LLC to John for each month of defendant's nonpayment.

We first address defendant's argument regarding the absence of an acceleration clause in the contract. "Courts have used the 'installment contract' approach in a variety of situations." Metromedia Co. v. Hartz Mountain Assocs., 139 N.J. 532, 535 (1995). "'[A] breach of an installment contract by non-payment does not constitute a breach of the entire contract.'" In re Est. of Balk, 445 N.J. Super. 395, 401 (App. Div. 2016) (quoting U.S. Bank Nat'l Ass'n v. Gullotta, 899 N.E.2d 987, 992 (Ohio 2008) (holding that "by agreeing to an acceleration clause, . . . parties . . . [can] avoid[] the . . . rule that nonpayment on an installment loan does not constitute a breach of the entire contract")).

"The installment contract method provides that 'claims based on installment contracts or other divisible, installment-type payment requirements

accrue with each subsequent installment,'" and, "[u]nless there is a repudiation, 'a plaintiff may sue for each breach only as it occurs.'" Id. at 400 (quoting Cnty. of Morris v. Fauver, 153 N.J. 80, 107-108 (1998)). "A repudiation 'entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due.'" Id. at 401 (quoting Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002)).

Thus, "a missed payment is insufficient to constitute a total breach of an installment contract or agreement unless accompanied by anticipatory repudiation indicating a failure to perform future obligations specified in the contract." Id. at 401. But, as Justice Cardozo succinctly expressed in Smyth v. United States, 302 U.S. 329, 356 (1937): "[T]he doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money only." See also N.Y. Life Ins. Co. v. Viglas, 297 U.S. 672, 680 (1936) (finding "a party to a contract who has no longer any obligation of performance on his side, but is in the position of a creditor exacting payment from a debtor, may be compelled to wait for the instal[l]ments as they severally mature," in the same way that "a landlord may not accelerate the rent for the residue of the term because the rent is in default for a month or for a year").

A-1199-20

Moreover, other jurisdictions facing this issue have determined the "anticipatory breach" doctrine does not apply to unilateral contracts, particularly for the payment of money only. See, e.g., Phelps v. Herro, 137 A.2d 159, 164 (Md. 1957) (holding "the doctrine of anticipatory breach of a contract has no application to money contracts, pure and simple, where one party has fully performed his undertaking, and all that remains for the opposite party to do is to pay a certain sum of money at a certain time or times"); Mabery v. W. Cas. & Sur. Co., 250 P.2d 824, 828-29 (Kan. 1952) ("'[A]llowing the promisee immediate recovery is nothing but a direct bonus to the promisee beyond what he was promised and a direct penalty to the promisor.'" (quoting 5 Williston on Contracts § 1328 (rev. ed. 1937))); Rosenfeld v. City Paper Co., 527 So.2d 704, 706 (Ala. 1988) (explaining "the use of the 'acceleration of maturity of payment' clause is in recognition of the nonapplicability of the anticipatory breach doctrine in installment payment contracts"); Meigs v. Est. of Mobley, 134 So.3d 878, 889 (Ala. 2013) (holding "a borrower must specifically agree to the acceleration of payments" in both written and oral agreements); see also Restatement (Second) of Contracts § 243(3) (Am. Law Inst. 1981) (stating "[w]here at the time of the breach the only remaining duties of performance are those of the party in breach and are

A-1199-20

for the payment of money in installments not related to one another," the "breach by non-performance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.").

Here, when the judgment was entered, defendant had missed twelve payments from December 2019 to December 2020. Because the contract did not contain an acceleration clause providing for the accelerated maturity of all installment payments upon default, plaintiffs' only claims were for the missed payments as of December 4, 2020, plus interest. Thus, the judge erred in awarding judgment to plaintiffs for the entire unpaid balance that remained due and owing under the agreement. See Gen. Elec. Credit Corp. v. Castiglione, 142 N.J. Super. 90, 97 (Law. Div. 1976) ("Absent a clause providing for the accelerated maturity of all installment payments upon default, there can be no such acceleration. To be enforceable the option to accelerate must be clear and certain. It will not be supplied by mere inference.") (citing Krosnowski v. Krosnowski, 22 N.J. 376, 383 (1956)).

Next, we turn to the contract provision providing John with five percent ownership in Chick Wrestler LLC for each month of defendant's default. In addressing the issue, we must first determine whether the provision "is an

enforceable liquidated damages provision or is an unenforceable penalty clause." Wasserman's Inc. v. Twp. of Middletown, 137 N.J. 238, 248 (1994).

Historically, New Jersey courts have distinguished between liquidated damages and penalty clauses. Ibid. On the one hand,

> [l]iquidated damages is the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damages that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs.
>
> [Ibid. (quoting Westmount Country Club v. Kameny, 82 N.J. Super. 200, 205 (App. Div. 1964)).]

On the other hand, "'[a] penalty is the sum a party agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.'" Id. at 248-49 (quoting Westmount, 82 N.J. Super. at 205). As to the latter, because "'[t]he settled rule in this State is that such a contract is unlawful,'" "'[p]arties to a contract may not fix a penalty for its breach.'" Id. at 249 (quoting Westmount, 82 N.J. Super. at 205).

"Thus, '"[l]iquidated damages" and "penalties" are terms used to reflect legal conclusions as to the enforceability or nonenforceability, respectively, of stipulated damage clauses.'" Id. at 248 (alteration in original) (quoting

21

Kenneth W. Clarkson et al., <u>Liquidated Damages v. Penalties: Sense or Nonsense?</u>, 1978 <u>Wis. L. Rev.</u> 351, 351 n.1 (1978)). "The decision whether a stipulated damages clause is enforceable is a question of law for the court." <u>Id.</u> at 257. "As the law has evolved, . . . 'reasonableness' emerges as the standard for deciding the validity of stipulated damages clauses." <u>Id.</u> at 249.

> Consistent with the principle of reasonableness, New Jersey courts have viewed enforceability of stipulated damages clauses as depending on whether the set amount "is a reasonable forecast of just compensation for the harm that is caused by the breach" and whether that harm "is incapable or very difficult of accurate estimate."
>
> [<u>Id.</u> at 250 (quoting <u>Westmount</u>, 82 N.J. Super. at 206).]

However, "[u]ncertainty or difficulty in assessing damages is best viewed not as an independent test, but rather as an element of assessing the reasonableness of a liquidated damages clause." <u>Ibid.</u> (citations omitted). Thus, "the more uncertain the damages caused by a breach, the more latitude courts g[i]ve the parties on their estimate of damages." <u>Metlife Cap. Fin. Corp. v. Wash. Ave. Assocs. L.P.</u>, 159 N.J. 484, 494 (1999). "'[T]he parties' characterization of stipulated damages as "liquidated damages" or as a "penalty" should not be dispositive.'" <u>Holtham v. Lucas</u>, 460 N.J. Super. 308, 318 (App. Div. 2019) (quoting <u>Wasserman's</u>, 137 N.J. at 251). "Since

22

'considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses,' a party challenging such a clause bears the burden to show it is unreasonable." Ibid. (quoting MetLife, 159 N.J. at 496, 504).

The agreement at issue explicitly stated if defendant defaulted on the loan, John was entitled to five percent ownership of Chick Wrestler LLC "for each month that passes where there is no payment or remedy made to correct the unpaid balance." Although the question of whether a stipulated damages clause is enforceable "is one of law, it may require resolution of underlying factual issues." Wasserman's, 137 N.J. at 257.

Here, the judge did not resolve the underlying factual issues, finding instead that "[t]here [was] no evidence before th[e] court" that the provision "was ever enforced, or, if enforced, whether that [five percent] interest has or had any monetary value." Because we are convinced that resolution of those factual issues is crucial to a determination of whether the stipulated damages clause is enforceable and, if so, the proper measure of damages, we remand the matter to the trial court to consider the reasonableness of the clause in light of this opinion. See Rosen v. Smith Barney, Inc., 195 N.J. 423, 427 (2008) ("[A]

23

contractual term fixing an unreasonably large liquidated damage amount is a penalty, which is unenforceable on grounds of public policy.").

In sum, we affirm the December 7, 2020 order granting plaintiffs summary judgment on their claim against defendant for breach of contract. We vacate the judgment awarding plaintiffs $33,777.65 in damages and remand for the trial court to recalculate damages and enter an appropriate final order consistent with this opinion. We leave to the sound discretion of the trial court the extent to which additional proof is necessary to resolve the issues involving valuation and ownership of Chick Wrestler LLC.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION